25 P.3d 88

Patrick SHERIDAN, Susan Sheridan, husband and wife individually and as Guardians Ad Litem for Cal Sheridan, a minor, Plaintiffs–Respondents,

v.

ST. LUKE'S REGIONAL MEDICAL CENTER, Defendant–Appellant,

and

John J. Jambura, M.D., David B. Bettis, M.D. and John Does I–V, Defendants.

No. 25810.

Supreme Court of Idaho, Boise, February 2001 Term.

May 22, 2001.

Gjording & Garrett, Boise, for appellant. Jack S. Gjording, argued.

Hepworth, Lezamiz & Hohnhorst, Boise, for respondents. John J. Janis, argued.

TROUT, Chief Justice.

This is an appeal from the district judge's grant of a new trial under I.R.C.P. 59(a)(6) and denial of St. Luke's Regional Medical Center's ("St.Luke's") motion for directed verdict.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

This is a medical malpractice case filed by respondents Pat and Sue Sheridan on behalf of themselves and their minor son, Cal ("the Sheridans"). In August 1997, the Sheridans filed suit against John J. Jambura, M.D., St. Luke's, Craig D. Wittlesey, M.D., Steven Mayfield, M.D., and David B. Bettis, M.D., alleging the defendants' medical treatment was negligent and fell below the applicable standard of care owed to Cal Sheridan, and as a direct and proximate result of the negligence, the Sheridans suffered severe physical, emotional and economic injuries. Specifically, the Sheridans argue St. Luke's and Dr. Jambura negligently treated their son Cal's jaundice and elevated bilirubin levels, leading to permanent and irreparable brain damage. Prior to trial defendant Mayfield obtained an Order Granting Summary Judgment, and defendant Whittlesey obtained an Order of Dismissal. Beginning February 8, 1999, a twenty-eight day trial was held, in-

cluding 32 witnesses and the admission of 112 exhibits. The jury deliberated for two days and returned defense verdicts in favor of Dr. Jambura, Dr. Bettis and St. Luke's. The Sheridans filed a motion for judgment as a matter of law or alternatively for new trial. Pursuant to I.R.C.P. 59(a)(6), the trial court granted the Sheridans' motion for new trial against Dr. Jambura and St. Luke's, but denied the motion for new trial against Dr. Bettis.

Cal Sheridan was born at 11:52 p.m. on March 23, 1995 at St. Luke's. Dr. Jambura examined Cal approximately 10 hours after birth. Within 17 hours of birth, a nurse's chart note indicated the presence of jaundice. The pediatrician, Dr. Jambura, was not notified. The next shift nurse also noted jaundice, approximately 24 hours after birth. Jambura again was not notified. On March 25, 33–34 hours after birth, Dr. Jambura examined Cal, performed a circumcision, and cleared Cal to leave the hospital. At the time of his discharge, the medical chart noted Cal "has moderate icterus on head, mild icterus on body." The Sheridan's were provided a handout on jaundice. Cal's bilirubin levels were not measured and the parents were not offered any special counseling regarding abnormal jaundice.

Dr. Jambura next saw Cal on March 28, approximately 78 hours after the hospital discharge and in his fifth day of life. Mrs. Sheridan called Dr. Jambura because Cal had ceased to feed as vigorously, seemed sleepy and lethargic and was still yellow. Dr. Jambura noted that Cal's jaundice had increased and discovered Cal was suffering from an ear infection in both ears. Cal was not hospitalized but was treated with an oral antibiotic for the ear infection.

On March 29, Mrs. Sheridan again telephoned Dr. Jambura to inform him Cal was not improving and the jaundice had increased. Dr. Jambura ordered Cal admitted to the St. Luke's pediatric unit. Upon admission at 4:50 p.m. Cal's bilirubin level was tested and reported to be 34.6/100ml. Dr. Jambura arrived at the hospital at 6:30 p.m. and consulted Dr. Mayfield, a hospital-based neonatologist regarding Cal's condition. Mayfield recommended a second bilirubin

test. While awaiting the tests, Cal was placed under a double bank of bili lights for phototherapy treatment of his jaundice. The second test results confirmed the high bilirubin level. Phototherapy was continued. A blood exchange transfusion, which would have resulted in an immediate reduction in the bilirubin levels, was not performed.

On March 30, Cal began exhibiting movements described as opisthotonos, arching or hyperextension of the neck. Cal also exhibited a sharp, high-pitched cry. Dr. Jambura requested a neurological consultation from Dr. Bettis, and Dr. Merrit, an ear, nose and throat specialist. Dr. Bettis ordered a magnetic resonance imaging (MRI) study, x-rays, and other tests. Cal was released from the hospital on April 2, 1995.

Over the next sixteen months Cal was treated by Dr. Jambura and Dr. Bettis and was ultimately diagnosed with cerebral palsy. An evaluation by Forrest Bennett, M.D., eventually led to a diagnosis of kernicterus, a form of cerebral palsy associated with a neonatal history of elevated serum bilirubin and consequent jaundice.

## II.

## GRANT OF NEW TRIAL UNDER I.R.C.P. 59(a)(6)

### A. Standard of Review

Idaho Rules of Civil Procedure, Rule 59(a)(6) provides:

A new trial may be granted to all or any of the parties and on all or part of the issues in an action for any of the following reasons: . . .

(6) Insufficiency of the evidence to justify the verdict or other decision, or that it is against the law.

A trial judge may grant a new trial based on I.R.C.P. Rule 59(a)(6) where "after he has weighed all the evidence, including his own determination of the credibility of the witnesses, he concludes the verdict is not in accord with his assessment of the clear weight of the evidence." *Quick v. Crane*, 111 Idaho 759, 766, 727 P.2d 1187, 1194 (1986). The trial court is given broad discretion in this ruling. *Id.* The trial judge may set aside

the verdict even though there is substantial evidence to support it. *Id.* (citation omitted). In addition, the trial judge is not required to view the evidence in a light most favorable to the verdict-winner. *Id.* Addressing the considerable discretion given to the trial court in deciding motions for new trials, this Court has said:

> "[t]he trial court may grant a new trial when it is satisfied the verdict is not supported by, or is contrary to, the evidence, or is convinced the verdict is not in accord with the clear weight of the evidence and that the ends of justice would be subserved by vacating it, or when the verdict is not in accord with either law or justice."

*Blaine v. Byers,* 91 Idaho 665, 671, 429 P.2d 397, 403 (1967) (citing *Tibbs v. City of Sandpoint,* 100 Idaho 667, 669, 603 P.2d 1001, 1003 (1979)). Furthermore, "[i]f having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial." *Quick,* 111 Idaho at 768, 727 P.2d at 1196.

■ This Court has specifically outlined the standard of appellate review of a grant of a new trial under Rule 59(a)(6).

> When considering an appeal from a district court's ruling on a motion for new trial, this Court applies the abuse of discretion standard. *Bott v. Idaho State Building Authority,* 122 Idaho 471, 835 P.2d 1282 (1992). This Court consistently has recognized the district court's wide discretion to grant or refuse to grant a new trial, and, on appeal, this Court will not disturb a district court ruling, absent a showing of manifest abuse of that discretion. *First Realty & Investment Co. v. Rubert,* 100 Idaho 493, 600 P.2d 1149 (1979). Although this Court necessarily must review the evidence, it primarily focuses on the process by which the district court reached its decision, not on the result of the district court's decision. *Quick v. Crane,* 111 Idaho 759, 727 P.2d 1187 (1986). Thus, the sequence of this Court's inquiry is:
> (1) whether the district court correctly perceived the issue as one of discretion;
> (2) whether the district court acted within

the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the district court reached its decision by an exercise of reason.

*Hughes v. State of Id. Dept. of Law,* 129 Idaho 558, 561, 929 P.2d 120, 123 (1996) (citing *Sun Valley Shopping Center v. Idaho Power,* 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991)). This Court's review of the evidence is not a weighing of the evidence.

> The trial court is in a far better position to weigh the demeanor, credibility and testimony of witnesses, and the persuasiveness of all the evidence. Appellate review is necessarily more limited. While we must review the evidence, we are not in a position to "weigh" it as the trial court can.

*Quick,* 111 Idaho at 770, 727 P.2d at 1198 (citing *Dinneen v. Finch,* 100 Idaho 620, 626, 603 P.2d 575, 581 (1979)). The focus, instead, is on the process by which the court reached its result. *Hughes,* 129 Idaho at 561, 929 P.2d at 123.

**B. Discussion**

■ As noted above, the review of a grant of a new trial under I.R.C.P. Rule 59(a)(6) is under an abuse of discretion standard, which invokes the three-part *Sun Valley* test. *See Sun Valley Shopping Ctr. v. Idaho Power,* 119 Idaho 87, 803 P.2d 993 (1991).

*(1) The district judge properly perceived the grant of new trial as an issue of discretion.*

The first inquiry under the *Sun Valley* test is whether the district judge correctly perceived the issue as one of discretion. 119 Idaho at 94, 803 P.2d at 1000. The district judge's Memorandum Decision demonstrates the judge perceived the Rule 59(a)(6) issue as one of discretion, stating that:

> Under Rule 59(a)(6), I am to make my own findings of fact and conclusions of law, and measure my findings against that of the jury.... If I conclude, based upon my assessment of the evidence, that the jury result was wrong, I may intervene and grant a new trial .... I am directed to act with restraint. I am to respect the

collective wisdom of the jury, and to intervene only if I am convinced that an injustice has been done and a mistake has been made.

*(2) The district judge acted within the outer boundaries of his discretion and consistently with the legal standards applicable to the specific choices available to him.*

The second inquiry under the *Sun Valley* test requires this Court to determine whether the judge acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to him. 119 Idaho at 94, 803 P.2d at 1000. In reviewing a decision on a motion for new trial, this element is analyzed under a two-prong test. *Burggraf v. Chaffin,* 121 Idaho 171, 174, 823 P.2d 775, 778 (1991).

> The first prong directs the trial judge to consider whether the verdict was against the weight of the evidence and if the ends of justice would be served by vacating the verdict. The second prong ... directs the trial court to consider whether a different result would follow in a retrial.

*Id.* (citing *Robertson v. Richards,* 115 Idaho 628, 769 P.2d 505 (1989); *Blaine v. Byers,* 91 Idaho 665, 429 P.2d 397 (1967)).

▆ The first prong simply requires the district court to make an independent determination as to whether the evidence supports the verdict. The district judge understood and applied this standard, recognizing:

> I am not obligated to construe the evidence in favor of one side or the other, but am directed to weigh all of the evidence in making my analysis. If I conclude, based upon my assessment of the evidence, that the jury result was wrong, I may intervene and grant a new trial.

▆ The district judge clearly understood his role in weighing the evidence, however, St. Luke's argues the district judge's analysis of the defense experts is unsupported by the record. Specifically, regarding the diagnosis of kernicterus, St. Luke's argues it was an abuse of discretion for the trial judge, "with no medical training or expertise, to presume to reach the sweeping conclusion that one side of this serious and complex medical debate was wrong" and to discount the evidence presented by the defense. This Court has long recognized that the trial judge, sitting at the heart of the trial process, is in a position that those on the appellate level cannot duplicate. *Robertson,* 115 Idaho at 631, 769 P.2d at 508. The "trial court is in a far better position to weigh the demeanor, credibility, and testimony of witnesses, and the persuasiveness of all the evidence." *Burggraf,* 121 Idaho at 173, 823 P.2d at 777 (citing *Quick,* 111 Idaho at 770, 727 P.2d at 1198). Because trial judges stand in the unique position of having heard all of the testimony and examined all of the evidence, their weighing of the evidence in a motion for new trial is given considerable discretion. *Quick,* 111 Idaho at 767, 727 P.2d at 1198. *See also, Robertson,* 115 Idaho at 631, 769 P.2d at 508. The district judge's determination to discount the testimony of the defendant's expert witnesses was a proper exercise of his discretion in weighing the demeanor, credibility and persuasiveness of the evidence.

▆ St. Luke's further argues the use of a combined verdict, which combined the elements of negligence and proximate cause, impeded the district judge's ability to conduct a meaningful review. This argument misunderstands the district judge's role in granting a new trial. The district judge is not reviewing the jury verdict, but is directed to independently review the evidence. *Quick,* 111 Idaho at 766, 727 P.2d at 1194. Furthermore, the judge is specifically not required to view the evidence in a light most favorable to the verdict-winner. *Id.* at 767, 727 P.2d at 1195. Therefore, the use of the combined verdict form did not impact the district judge's ability to make his own determination that the jury verdict was against the weight of the evidence.

The district judge properly made an independent evaluation of the demeanor, credibility, and testimony of the witnesses, and the persuasiveness of all the evidence. Based on this evaluation, he concluded the verdict was against the weight of the evidence and the ends of justice would be served by vacating

it. Therefore, the first prong of the *Blaine* test is met.

▪ The second prong of the *Blaine* test requires the trial court to consider whether a different result would follow in a retrial. *Burggraf,* 121 Idaho at 174, 823 P.2d at 778. This standard requires more than a mere possibility; there must be a probability that a different result would be obtained in a new trial. *Id.* at 174 n. 3, 823 P.2d at 778 n. 3. St. Luke's argues the district judge failed to satisfy the second prong of *Blaine* by stating in the Memorandum Decision that there was only a "possibility that the nurses might have prevented this catastrophe at the outset." This statement is a comment on the nurses' ability to prevent Cal's injuries, not an assessment of whether a different result would be achieved upon a new trial. The Memorandum Decision specifically states:

> I conclude that a clear mistake was made, and that it would be an injustice not to permit the plaintiff to try this case again against [St. Luke's]. I am satisfied that a properly deliberative jury, faced with this evidence in a new trial, *would* reach a different conclusion.

(emphasis added). This statement alone satisfies the second prong of *Blaine.*

The district judge correctly identified and applied the standards governing its decision to grant a new trial. First, he acknowledged he was required to make an independent evaluation. Based on his evaluation of the expert witnesses and the persuasiveness of all the evidence, the district judge concluded the jury made a mistake, an injustice had been done, and a different result would follow in a retrial. Therefore, we find the district judge acted within the outer bounds of his discretion and consistently with the legal standards applicable to the specific choices available to him.

*(3) The district judge reached his decision by an exercise of reason.*

▪ Our final inquiry under the three-part *Sun Valley* test is whether the district judge reached his decision by an exercise of reason. 119 Idaho at 94, 803 P.2d at 1000. Our role again is to review the process of the district judge in rendering his decision. *Quick,* 111 Idaho at 772, 727 P.2d at 1200. In order for this Court to perform this function properly, we require the district judge to disclose his reasoning for granting or denying the motion for a new trial unless those reasons are obvious from the record itself. *Id.*

St. Luke's argues the district judge failed to give careful consideration to the relevant factual circumstances by basing his decision to set aside the jury's verdict on facts that were mischaracterized in the Memorandum Decision as "undisputed". This argument centers on the section in the Memorandum Decision entitled "Undisputed Facts", which included both undisputed facts and testimony that was arguably disputed by other information. Despite the imprecision in naming the facts section, a review of the entire decision shows the district judge carefully considered the relevant factual circumstances, clearly indicated the facts he believed were truly uncontroverted, and understood the facts in dispute. For example, St. Luke's incorrectly asserts the district judge improperly eliminated the defense expert evidence and characterized the diagnosis of kernicterus as "undisputed". However, the Memorandum Decision demonstrates the district judge recognized and considered the defense testimony disputing the diagnosis of kernicterus and carefully considered the issue of proximate cause. The district judge specifically addressed the conflicting interpretations of the MRI studies performed on Cal, and "the testimony of Dr. Moltini, who thought it was a virus, and of Drs. Glass and Vleck, who was only 49% sure it was kernicterus." Clearly he understood the diagnosis of kernicterus was not undisputed. After considering the conflicting expert testimony, the district judge found the evidence was compelling that Cal was indeed suffering from kernicterus. The district judge's determination to discount the testimony of the defendant's expert witnesses was not an inappropriate mischaracterization of the evidence, or a misunderstanding of the disputed diagnosis, but was a proper exercise of his discretion in weighing the demeanor, credibility and persuasiveness of the evidence.

St. Luke's also argues the district judge abused its discretion in granting a new trial to the Sheridans because a causal link was not established between the alleged negligence of St. Luke's and Cal's injuries. This argument parallels St. Luke's argument in support of their motion for a directed verdict for failure to show proximate cause. As discussed below in Part III, B, the element of proximate cause can be established through a "chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable." *Formont v. Kircher*, 91 Idaho 290, 296, 420 P.2d 661, 667 (1965)(quoting *Reinhold v. Spencer*, 53 Idaho 688, 690, 26 P.2d 796, 798 (1933) (citation omitted)). The Memorandum Decision outlines the process and reasoning of the district judge in concluding the causal link had been established.

The hospital did not have in place any protocols or policies on jaundice. The general policies and protocols required the newborn nursery nurses to notify the pediatrician when any general abnormal symptoms or conditions were noted. None of the nurses notified the pediatrician in this case. The nurses instructed mom only on the progress of normal jaundice but did not warn mom that the jaundice in this case might not be normal, and that serious brain damage could occur if it worsened and was not treated. Finally, the nurses knew that no bilirubin tests had been conducted, although such tests were routine and readily available. They did not suggest such to the pediatrician, although such suggestions are often offered to physicians and usually acted upon. If not accepted or acted upon, there is a procedure within the hospital for a nurse to act as the patient's advocate, and insist that the physician's decision on treatment be reviewed. This did not occur. Finally ... there was a failure to establish any policy with regard to the handling of core blood retrieved on birth—particularly whether it was or should have been tested to reveal the possible blood incompatibility between Cal and his mom. The confusion in the chart led the doctors to assume that the blood types were the same when they were not. Dr. Jambura testified that if he had

realized that Cal's blood was different than his mom's, he would have treated the hyperbilirubinemia more aggressively.

The two nurses who cared for Cal during the first 24 hours both noted the existence of jaundice—one at 17 hours of life and the other at 23 hours of life. Although both testified that they would be concerned if the jaundice progressed rapidly—that it was the progress of the jaundice rather than the mere presence of it that would be of concern to them—neither noted on chart any indicia from which the progress could be ascertained. The later nurses made no inquiry of earlier nurses to ascertain the progress of jaundice. The third nurse to care for Cal on the morning of his discharge noted that the jaundice was present over his entire body—moderate on head and mild on trunk and extremities—but did not consider this as alarming ....

While I think the pediatrician in this case must bear the brunt of responsibility for the mismanagement of Cal's care, in my mind at least some degree of fault is attributed to the failure of the newborn nurses to be the "physician's eyes and ears" at the outset of Cal's life. I am satisfied that if the nurses had sounded the alarm upon the first observation of jaundice, and had pressed for appropriate bilirubin monitoring before he was discharged from the hospital the first time, the catastrophe that befell a few days later *would* have been completely averted.

Based on the conduct of the nurses, and the district judge's determination that the evidence offered by the plaintiff on the issue of the diagnosis of kernicterus overwhelmed the defense witnesses and evidence, the district judge concluded, "any errors in the identification and treatment of the predicate hyperbilirubinemia were a proximate cause of this condition."

Defense experts disputed some of evidence in the chain of circumstances described by the district judge. However, it is within the district judge's broad discretion to set aside the verdict, even when there is substantial evidence to support it. *Quick*, 111 Idaho at 766, 727 P.2d at 1194. The district judge's conclusion that the causal link had been es-

tablished was based on expert testimony regarding the standard of care, medical research and knowledge of the impact of high bilirubin levels in a newborn and expert testimony regarding the long term damage that can be caused by those high bilirubin levels. Therefore, we find this conclusion was reached by an exercise of reason.

St. Luke's next argues the district judge failed to address their argument that intervening, superceding forces cut off any causal link between the hospital's involvement and the occurrence of brain damage. However, the district judge specifically acknowledged:

> There is no allegation or evidence of any negligence or breach on the part of the hospital or staff after Cal's discharge from the hospital on March 26. There is an argument that the subsequent acts of the pediatrician superseded any negligence of the hospital. However, I am persuaded in this case that the overwhelming evidence indicates a finding of some degree of fault on the part of the hospital, notwithstanding the later omissions of the pediatrician.

Finally, St. Luke's argues the district judge abused his discretion by concluding because he granted a new trial as to defendant Jambura, it was necessary to grant a new trial as to St. Luke's. Idaho Rules of Civil Procedure, Rule 59(a) allows a trial court to grant a new trial to all or any of the parties. *Watson v. Navistar Intern. Transp. Corp.,* 121 Idaho 643, 669, 827 P.2d 656, 682 (1992). The law is well established that the trial court's determination whether to include some or all of the parties is discretionary. *Id.* (citing *Smallwood v. Dick,* 114 Idaho 860, 761 P.2d 1212 (1988)). The test for determining whether a party can be excluded from an order for a new trial is whether there is a clear showing that the issues in the case are so distinct and separable that a party may be excluded without prejudice. *Id.* (citation omitted). Applying this standard, the district judge properly recognized his discretionary authority to grant a new trial as to one or both of the parties. In his Memorandum Decision, he specifically noted the "close relationship between the nurses and physicians, and the interrelationship expected of them in the first hours of an infant's life" and concluded, "I think it necessary for a new jury to reconsider the conduct of both in this case." The district judge exercised reason in concluding the actions of the hospital and doctors were so intertwined as to necessitate a new trial for both.

The Memorandum Decision shows a careful analysis of St. Luke's arguments, the facts in dispute, and the applicable principles of law. The district judge specifically articulated the reasons for granting a new trial against St. Luke's. He has clearly given due consideration to the facts and circumstances of the case, and correctly applied the law thereto; therefore, we find his decision to grant a new trial was based on an exercise of reason.

## III.

## MOTION FOR DIRECTED VERDICT

### A. Standard of Review

St. Luke's additionally appeals the denial of their motion for directed verdict on the element of proximate cause and damages brought at the end of the Sheridan's rebuttal case. "Upon making the motion, the moving party admits to the truth of all the adverse evidence and any legitimate inference that can be drawn from it." *Lunders v. Snyder,* 131 Idaho 689, 695, 963 P.2d 372, 378 (1998)(citing *Quick v. Crane,* 111 Idaho 759, 763, 727 P.2d 1187, 1191 (1986)). "In determining whether a directed verdict ... should have been granted, the appellate court applies the same standard as does the trial court which passed on the motion originally." *Id.* However, this Court exercises free review and does not defer to the findings of the trial court. *Id.*

> [This Court] must determine whether, admitting the truth of the adverse evidence and drawing every legitimate inference most favorably to the opposing party, there exists substantial evidence to justify submitting the case to the jury. *Herrick v. Leuzinger,* 127 Idaho 293, 297, 900 P.2d 201, 205 (Ct.App.1995). "The 'substantial evidence' test does not require the evidence be uncontradicted. It requires only that the evidence be of sufficient quantity

and probative value that reasonable minds could conclude that a verdict in favor of the party against whom the motion is made is proper." *All v. Smith's Management Corp.*, 109 Idaho 479, 480, 708 P.2d 884, 885 (1985).

*General Auto Parts Co., Inc. v. GPC*, 132 Idaho 849, 855, 979 P.2d 1207, 1213 (1999). Therefore, "[a] directed verdict is proper only where the evidence is so clear that all reasonable minds would reach only one conclusion: that the moving party should prevail." *Student Loan Fund of Idaho v. Duerner*, 131 Idaho 45, 51, 951 P.2d 1272, 1278 (1997)(quoting *Lawton v. City of Pocatello*, 126 Idaho 454, 458, 886 P.2d 330, 334 (1994)).

## B. Discussion

 St. Luke's appeals the denial of their motion for directed verdict arguing the record contains no medical testimony to link the breach of the standard of care by the nursing staff in the first hospital admission to the damage that may have been caused from hyperbilirubinemia and the diagnosis of kernicterus. Therefore, they argue the elements of proximate cause and damages have not been established. The hospital acknowledges "the only link that was made pursuant to our review of the record, was by the nurse experts put on by the plaintiff"; however, they contend proximate cause must be shown by competent, expert testimony and argue the testimony of the nurses was insufficient.

 There is no dispute that in a suit alleging medical malpractice, the plaintiff must prove both that the defendant breached a duty and that this breach proximately caused the plaintiff's injuries. *See Conrad v. St. Clair*, 100 Idaho 401, 404, 599 P.2d 292, 295 (1979). Idaho Code §§ 6–1012 and 6–1013 require the applicable standard of care, and the failure to meet such standard in medical malpractice cases, *must* be established by direct expert testimony. Based on this statutory requirement, we rejected the doctrine of *res ipsa loquitur* as a means of proving breach of duty in medical malpractice cases. *Kolln v. Saint Luke's Regional Medical*, 130 Idaho 323, 334, 940 P.2d 1142, 1153 (1997). However, this statutory language and precedent only address proof of standard of care, and breach of the standard of care in medical malpractice cases. The issue presented by St. Luke's is whether direct expert testimony is also required to show proximate cause. Unlike the elements of duty and breach of duty, there is no statutory requirement explicitly stating proximate cause in medical malpractice cases must be shown by direct expert testimony. Therefore, testimony admissible to show proximate cause in a medical malpractice case, like any other case, is governed by the rules of evidence regarding opinion testimony by lay witnesses and experts under Idaho Rules of Evidence 701 and 702.

Furthermore, according to our precedent, proximate cause can be shown from a "chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable." *See Formont*, 91 Idaho at 296, 420 P.2d at 667 (citation omitted). *See also, Hake v. DeLane*, 117 Idaho 1058, 793 P.2d 1230 (1990). In *Formont*, the plaintiff had an infection in his leg that went untreated and eventually the leg was amputated. The trial court made specific findings that defendant breached the requisite standard of care, and there was evidence that proper care could have been expected to produce different results. However, the trial court concluded there was not enough proof of proximate cause. The question on appeal was whether the trial court erred in finding the care, or lack of care, by the defendant-physician was not established to be the proximate cause of the loss of the plaintiff's leg. This Court reversed, stating the rule:

Respondent was not required to prove his case beyond a reasonable doubt, nor by direct and positive evidence. It was only necessary that he show a chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable. *Helland v. Bridenstine*, 55 Wash. 470, 104 P. 626. As is said in *Dimock v. Miller*, 202 Cal. 668, 262 P. 311:

"If the rule of law is as contended for by defendant and appellant, and it is necessary to demonstrate conclusively and beyond the possibility of a doubt that the negligence resulted in the injury, it would

never be possible to recover in a case of negligence in the practice of a profession which is not an exact science." (citations omitted).

*Id.* at 296, 420 P.2d at 667.

 Similar to *Formont,* St. Luke's is arguing there was no direct expert testimony on proximate cause. However, the testimony and evidence in the record present a chain of circumstances from which proximate cause can be reasonably and naturally inferred. There was testimony that jaundice showing within the first 24 hours is pathologic and requires further evaluation such as a serum bilirubin measurement. Evidence was also presented that high bilirubin levels can be successfully treated by the use of bili lights and blood exchange transfusions. There was no dispute that jaundice appeared in Cal within 24 hours of his birth. Nurses Sater and Brown testified that the hospital nurses breached their standard of care by not notifying Dr. Jambura when the jaundice appeared, not charting with particularity the progression of the jaundice, not noting the possible blood incompatibility problems with the mother and child, and by sending the Sheridans home from the hospital with information on physiologic jaundice (normal jaundice) but not warning them that Cal's jaundice was abnormal. Cal was later rehospitalized with hyperbilirubinemia and was later diagnosed with kernicterus, a form of cerebral palsy associated with a neonatal history of elevated bilirubin, a symptom of which is jaundice. Although the hospital's actions were limited to the first 36 hours of life, and it was days later before the high bilirubin levels were measured, a jury could reasonably and naturally infer from the chain of circumstances that a breach of the standard of care in the first hospital stay proximately caused Cal's injuries.

The evidence in this case was not uncontroverted; however, from our review of the record of the trial below, and drawing all inferences from the evidence in a light most favorable to the non-moving party, there was substantial evidence regarding proximate cause and damages to justify submitting the case to the jury.

## IV.

### ATTORNEY'S FEES

 St. Luke's requests attorney's fees under I.C. § 12–121, which provides "[i]n any civil action, the judge may award reasonable attorney's fees to the prevailing party." Because St. Luke's is not the prevailing party on appeal, they are not entitled to attorney's fees.

 The Sheridans also seek an award of attorney's fees. The only argument on this issue is a single sentence arguing the appeal is "without substantial justification in law or fact." "This Court will not consider issues cited on appeal that are not supported by propositions of law, authority, or argument." *Perkins v. U.S. Transformer West,* 132 Idaho 427, 432, 974 P.2d 73, 78 (1999) (citing *Meisner v. Potlatch Corp.,* 131 Idaho 258, 263, 954 P.2d 676, 681 (1998)). Because the Sheridans provided no argument or authority on the issue of attorney's fees, we decline to consider this issue as it relates to the Sheridans.

## V.

### CONCLUSION

The district judge recognized its discretionary authority, followed the legal standards governing disposition of the motion for a new trial, and reached its decision based upon an exercise of reason. Therefore, we find there was no abuse of discretion in the order granting a new trial under I.R.C.P. 59(a)(6). The district judge's decision to grant a new trial is affirmed. In addition, there was substantial evidence regarding proximate cause to justify submitting the case to the jury. Therefore, we uphold the district judge's denial of St. Luke's motion for directed verdict. We award costs on appeal to the Sheridans.

Justices SCHROEDER, WALTERS, KIDWELL and Judge Pro Tem HURLBUTT, concur.